IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
4:16-CV-37-FL

| | | |
|---|---|---|
| CLIFTON R. HARDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND RECOMMENDATION** |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

In this action, plaintiff Clifton R. Hardy ("plaintiff" or, in context, "claimant") challenges the final decision of defendant Acting Commissioner of Social Security Nancy A. Berryhill ("Commissioner") denying his applications for a period of disability and disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") on the grounds that he is not disabled.[1] The case is before the court on the parties' motions for judgment on the pleadings. D.E. 21, 25. Both filed memoranda in support of their respective motions. D.E. 22, 26. The motions were referred to the undersigned magistrate judge for a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). *See* 7 Dec. 2016 Text Ord. For the reasons set forth below, it will be recommended that the Commissioner's motion be allowed, plaintiff's motion be denied, and the final decision of the Commissioner be affirmed.

---

[1] The statutes and regulations applicable to disability determinations for DIB and SSI are in most respects the same. The provisions relating to DIB are found in 42 U.S.C. subch. II, §§ 401, *et seq.* and 20 C.F.R. pt. 404, and those relating to SSI in 42 U.S.C. subch. XVI, §§ 1381, *et seq.* and 20 C.F.R. pt. 416. The versions of the regulations cited herein are those in effect at the time of issuance of the decision of the administrative law judge ("ALJ").

## I. BACKGROUND

### A. Case History

Plaintiff filed an application for DIB on 7 September 2012 and an application for SSI on 29 November 2012, both alleging a disability onset date of 13 August 2012. Transcript of Proceedings ("Tr.") 15. The applications were denied initially and upon reconsideration, and a request for a hearing was timely filed. Tr. 15. On 15 August 2014, a video hearing was held before the ALJ, at which plaintiff, represented by counsel, and a vocational expert ("VE") testified. Tr. 38-75. The ALJ issued a decision denying plaintiff's claims on 23 September 2014. Tr. 15-31. Plaintiff timely requested review by the Appeals Council (Tr. 11), but on 1 February 2016, it denied the request (Tr. 7-10). At that time, the decision of the ALJ became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481. On 31 March 2016, plaintiff commenced this proceeding for judicial review of the ALJ's decision, pursuant to 42 U.S.C. §§ 405(g) (DIB) and 1383(c)(3) (SSI). *See* Mot. for Leave to Proceed *In Forma Pauperis* ("IFP") (D.E. 1); Ord. Granting IFP Mot. (D.E. 5); Compl. (D.E. 6).

### B. Standards for Disability

The Social Security Act ("Act") defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see id.* § 1382c(a)(3)(A); *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see id.* § 1382c(a)(3)(B). The Act

defines a physical or mental impairment as "an impairment that results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The disability regulations under the Act ("Regulations") provide a five-step analysis that

the ALJ must follow when determining whether a claimant is disabled:

> To summarize, the ALJ asks at step one whether the claimant has been working; at step two, whether the claimant's medical impairments meet the [R]egulations' severity and duration requirements; at step three, whether the medical impairments meet or equal an impairment listed in the [R]egulations; at step four, whether the claimant can perform [his] past work given the limitations caused by [his] medical impairments; and at step five, whether the claimant can perform other work.
>
> The first four steps create a series of hurdles for claimants to meet. If the ALJ finds that the claimant has been working (step one) or that the claimant's medical impairments do not meet the severity and duration requirements of the [R]egulations (step two), the process ends with a finding of "not disabled." At step three, the ALJ either finds that the claimant is disabled because [his] impairments match a listed impairment [*i.e.*, a listing in 20 C.F.R. pt. 404, subpt. P, app. 1 ("the Listings")] or continues the analysis. The ALJ cannot deny benefits at this step.
>
> If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity ["RFC"], which is "the most" the claimant "can still do despite" physical and mental limitations that affect [his] ability to work. [20 C.F.R.] § 416.945(a)(1).[2] To make this assessment, the ALJ must "consider all of [the claimant's] medically determinable impairments of which [the ALJ is] aware," including those not labeled severe at step two. *Id.* § 416.945(a)(2).[3]
>
> The ALJ then moves on to step four, where the ALJ can find the claimant not disabled because [he] is able to perform [his] past work. Or, if the exertion required for the claimant's past work exceeds [his] [RFC], the ALJ goes on to step five.

---

[2] *See also* 20 C.F.R. § 404.1545(a)(1).

[3] *See also* 20 C.F.R. § 404.1545(a)(2).

At step five, the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that "exists in significant numbers in the national economy," considering the claimant's [RFC], age, education, and work experience. *Id.* §§ 416.920(a)(4)(v); 416.960(c)(2); 416.1429.[4] The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations. If the Commissioner meets her burden, the ALJ finds the claimant not disabled and denies the application for benefits.

*Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir. 2015).

### C. ALJ's Findings

Plaintiff was 51 years old on the alleged onset date of disability and 53 years old on the date of the hearing. *See, e.g.*, Tr. 29 ¶ 7; 46. The ALJ found that plaintiff has at least a high school education. Tr. 29 ¶ 8. Adopting the testimony of the VE (Tr. 69), the ALJ also found that plaintiff had past relevant work as a cemetery worker (DOT # 406.684-010) and garbage collector driver (DOT #905.663-010)[5] (Tr. 29 ¶ 6).

The ALJ found that plaintiff met the insured status requirements under the Act through 31 December 2017. Tr. 17 ¶ 1. Applying the five-step analysis of 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the ALJ then found at step one that plaintiff had not engaged in substantial gainful activity since the alleged disability onset date, 13 August 2012. Tr. 17 ¶ 2. At step two, the ALJ found that plaintiff has the following medically determinable impairments that are severe within the meaning of the Regulations: degenerative disc disease; syncope and seizures; anemia; obstructive sleep apnea; gastroesophageal reflux disease and dysphagia; borderline intellectual functioning; tendinitis of the left wrist; a history of left knee injury with arthroscopic

---

[4] *See also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c)(2), 404.929.

[5] Although the ALJ uses the title "garbage collector" throughout his decision to refer to this job, the DOT occupational code number he cites is actually for the occupation entitled "garbage collector driver." *See* DOT #905.663-010. The VE does the same in his testimony. Tr. 69. It is apparent that the ALJ and the VE are using "garbage collector" to signify the occupation described in the DOT definition cited because their descriptions of the occupation match this definition. *See* Tr. 29 ¶ 6; 69. As discussed below, there is an occupation entitled "garbage collector" in the DOT, but its definition is different from that of "garbage collector driver." *Compare* DOT #955.687-022 (garbage collector) *with* DOT #905.663-010 (garbage collector driver).

surgery; a history of cerebrovascular accident; obesity; hiatal hernia; coronary artery disease; and hypertension. Tr. 17 ¶ 3. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or medically equals any of the Listings. Tr. 18 ¶ 4.

The ALJ next determined that plaintiff had the RFC to perform a limited range of light work:

> After careful consideration of the entire record, the undersigned finds the claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b),[6] with the following provisos: he can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. He can occasionally balance, but frequently stoop, kneel, crouch, and/or crawl. He must avoid concentrated exposure to temperature extremes of heat, as well as pulmonary irritants (such as fumes, odors, dust, gases, poor ventilation and the like). He must avoid all exposure to workplace hazards, such as dangerous moving machinery and unprotected heights. The claimant is able to understand and perform simple, routine, repetitive tasks, further defined as jobs with a reasoning level of 1 or 2. He can maintain concentration, persistence, and pace to stay on task for 2-hour periods during a typical 8-hour day in order to perform such tasks, in a work setting that is not production-pace or quota-based work, rather a goal oriented job primarily dealing with things as opposed to people, with no more than occasional changes in the work setting.

Tr. 22-23 ¶ 5.

Based on his determination of plaintiff's RFC, the ALJ found at step four that plaintiff was unable to perform his past relevant work. Tr. 29 ¶ 6. At step five, the ALJ accepted the testimony of the VE and found that there were jobs in the national economy existing in significant numbers that plaintiff could perform, including jobs in the occupations of bench assembler, electronics worker, and laundry folder. Tr. 30 ¶ 10. The ALJ accordingly concluded that plaintiff was not disabled from the alleged disability onset date, 13 August 2012, through the date of the decision, 23 September 2014. Tr. 31 ¶ 11.

---

[6] *See also Dictionary of Occupational Titles* (U.S. Dep't of Labor 4th ed. rev. 1991) ("DOT"), app. C § IV, def. of "Light Work," 1991 WL 688702. "Light work" and the other terms for exertional level as used in the Regulations have the same meaning as in the DOT. *See* 20 C.F.R. §§ 404.1567, 416.967.

## II.    STANDARD OF REVIEW

Under 42 U.S.C. §§ 405(g) and 1383(c)(3), judicial review of the final decision of the Commissioner is limited to considering whether the Commissioner's decision is supported by substantial evidence in the record and whether the appropriate legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Unless the court finds that the Commissioner's decision is not supported by substantial evidence or that the wrong legal standard was applied, the Commissioner's decision must be upheld. *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla of evidence, but somewhat less than a preponderance. *Id.*

The court may not substitute its judgment for that of the Commissioner as long as the decision is supported by substantial evidence. *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992). In addition, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979). A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion. *Blalock*, 483 F.2d at 775.

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Commissioner has considered all relevant evidence and sufficiently explained the weight given to probative evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). "Judicial review of an administrative decision is impossible

without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

## III.    OVERVIEW OF PLAINTIFF'S CONTENTIONS

Plaintiff contends that the ALJ's decision should be reversed and benefits awarded, or that this case should be remanded for a rehearing on the grounds that the ALJ erred in determining that plaintiff did not meet Listing 12.05 and that there are jobs that exist in significant numbers in the national economy that plaintiff can perform. The court will address each argument in turn.

## IV.    ALJ'S DETERMINATION ON LISTING 12.05

### A.    Listing Requirements

The Listings consist of impairments, organized by major body systems, that are deemed sufficiently severe to prevent a person from doing any gainful activity.    20 C.F.R. §§ 404.1525(a), 416.925(a).    Therefore, if a claimant's impairments meet a listing, that fact alone establishes that the claimant is disabled.    *Id.* §§ 404.1520(d), 416.920(d).    An impairment meets a listing if it satisfies all the specified medical criteria.    *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); Soc. Sec. R. 83-19, 1983 WL 31248, at *2 (1983).    The burden of demonstrating that an impairment meets a listing rests on the claimant.    *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).[7]

To meet Listing 12.05,[8] a claimant must first satisfy the introductory diagnostic description for intellectual disability.    *See* Listing 12.00A.    Specifically, the claimant must

---

[7] Even if an impairment does not meet the listing criteria, it can still be deemed to satisfy the listing if the impairment medically equals the criteria. *See* 20 C.F.R. §§ 416.925(c)(5), 416.926(a). Plaintiff does not contend that he medically equals Listings 12.05. Even if he did, any such contention would fail for the same reasons that he does not meet the Listing.

[8] Listing 12.05 reads in relevant part:

demonstrate "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period," that is, before the age of 22. Listing 12.05. General intellectual functioning is defined by the intelligence quotient ("IQ") obtained using one or more of the standardized, individually administered intelligence tests. *See* Am. Psychiatric Assn., *Diagnostic and Statistical Manual of Mental Disorders* (4th ed., text rev. 2000) ("DSM-IV-TR") 41.[9] Adaptive functioning "refers to how effectively individuals cope

---

12.05 Intellectual Disorder: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
OR
B. A valid verbal, performance, or full scale IQ of 59 or less;
OR
C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
OR
D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
1. Marked restriction of activities of daily living;
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

Listings 12.05 (spacing altered from original).

[9] "The DSM is widely recognized as the authoritative reference used in diagnosing mental disorders." *United States v. Wooden*, 693 F.3d 440, 452 n.4 (4th Cir. 2012) (internal quotation marks omitted). "The definition of M[ental] R[etardation] we [i.e., the Social Security Administration] use in our listings is consistent with, if not identical to, the definitions of MR used by the leading professional organizations," including the definition in the DSM. Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018–01, 2002 WL 661740, at *20022 (Soc. Sec. Admin. 24 Apr. 2002). Effective 3 September 2013, the Social Security Administration substituted the term "intellectual disability" for the term "mental retardation" in the Regulations, including the Listings. *See* 78 Fed. Reg. 46,499-01, 2013 WL 3936340 (Soc. Sec. Admin. 1 Aug. 2013).

The court notes that the current version of the DSM, the fifth edition ("DSM-5"), that was issued in May 2013, contains diagnostic criteria for intellectual disability different from those in the DSM-IV. *Compare* DSM-5 at 33 *with* DSM-IV-TR 49. Corresponding changes have been made to Listing 12.05 in an amendment effective 17 January 2017, but the amendment is applicable only to Social Security cases with application filing dates after the date of the amendment. Accordingly, the version in effect at the time of the ALJ decision is set forth herein.

with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM-IV-TR 42. Areas in which deficits in adaptive functioning may exist include "communication, self-care, home living, social/inter-personal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (citing *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002)).

In addition to the diagnostic description, to meet Listing 12.05 a claimant must satisfy the criteria set forth in at least one of four paragraphs relating to the severity of the intellectual disability. Paragraph B[10] requires a "valid verbal, performance, or full scale IQ of 59 or less." Listing 12.05B. Paragraph C requires a "valid verbal, performance, or full scale IQ of 60 through 70" and "a physical or other mental impairment imposing an additional and significant work-related limitation of function." Listing 12.05C. And Paragraph D requires a "valid verbal, performance, or full scale IQ of 60 through 70," resulting in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. Listing 12.05D.

---

Moreover, the Social Security Administration has previously explained that the Listing 12.05 diagnostic definition of mental retardation was based on not only the American Psychiatric Association's definition in the DSM-IV, but also on the definitions used by three other leading professional organizations and that it does not "seek to endorse the methodology of one professional organization over another." Technical Revisions, 2002 WL 661740, at 20022. For this reason, the court concludes that it remains appropriate to reference the diagnostic criteria in the DSM-IV-TR in applying Listing 12.05. *See Hightower v. Comm'r of Soc. Sec. Admin.*, No. 1:14-2761-RBH-SVH, 2015 WL 5008668, at *17 (D.S.C. 12 June 2015) ("Listing 12.05 was not updated to reflect the changes present in DSM-5, which calls into question the general applicability of DSM-5 to evaluation of intellectual disability under the Listing."), *rep. & recomm. adopted*, 2015 WL 5008713, at *8 (20 Aug. 2015).

[10] The ALJ found that the requirements of Listing 12.05A were not met, and plaintiff does not challenge that finding. *See* Tr. 20 ¶ 4.

**B.    Analysis**

The ALJ found that plaintiff did not meet Listing 12.05B, 12.05C, or 12.05D because,

although he had IQ scores within the required range, the record as a whole did not demonstrate

deficits in adaptive functioning sufficient to meet the diagnostic description.  With respect to the

IQ scores, the ALJ stated:

> The claimant has alleged disability due to an IQ score of 53 prior to attaining age
> 22 (Ex. 7E, p. 1).  The claimant's school records from Lenoir County reflect both
> Stanford-Binet Intelligence Scales and Slosson Intelligence test scores of 57 from
> the claimant's elementary school (Ex. 8E, p. 1).  The records also show what
> appears to be Short Form Test of Academic Aptitude (SFTAA) scores of 66 and
> 64 from March 1978, which would correspond with the claimant's junior year of
> high school (Ex. 8E, p. 4).

> As part of the evaluation by Disability Determination Services (DDS), the
> claimant underwent a consultative psychological evaluation on December 6,
> 2012, conducted by Jerome B. Albert, Ph.D.  During that examination, the
> claimant reported his last job was supervising inmates working in the community
> and he lost that job when his driver's license was suspended due to seizures. He
> indicated he had been married for 5 years, with no children. He reported having a
> high school certificate and alleged he was just pushed through school (Ex. 19F,
> pp.l-2).  Dr. Albert administered the Wechsler Adult Intelligence Scale (WAIS-
> IV), as well as the Wide Range Achievement Test (WRAT-IV).  He noted the
> claimant's test performance was suboptimal and he provided responses, such as
> not knowing what happened on September 11, 2001, or what the 4[] seasons were.
> The claimant's WAIS-IV scores produced a Verbal Comprehension Index of 51, a
> Perceptual Reasoning Index of 56, a Working Memory Index of 58, a Processing
> Speed Index of 59, and a Full Scale IQ of 48.  However, Dr. Albert[] did not
> provide a diagnosis of mental retardation or intellectual disability, but rather, an
> Axis II for probable borderline intellectual functioning based on his verbal scores
> and work history (Ex. 19F, p. 3).

Tr. 20 ¶ 4.

The ALJ then gave multiple reasons for finding plaintiff not to have demonstrated the

requisite deficits in adaptive functioning:

> While the claimant's IQ scores would facially appear to qualify as a listing-level
> impairment, the undersigned finds the record as a whole does not demonstrate the
> necessary deficits in adaptive functioning needed to meet 12.05 and Dr. Albert
> estimated borderline intellectual functioning, which fits the claimant's work

history. At the outset, it is noted the claimant initially denied being placed in special education in school and his school records do not specifically identify any such placement (Ex. 2E, p.3). The claimant worked steadily from 1998 through 2012, at well above [substantial gainful activity] levels (Ex. 4D). The claimant worked for a local government, starting as a sanitation worker and working the last 8 years as a cemetery supervisor (Ex. 3E, p. 1). The claimant was able to obtain and keep a driver's license, prior to the onset of seizures, and reported driving and operating machinery were elements of his previous jobs (Ex. 5E, pp. 2-3). On his cemetery supervisor job, he was responsible for supervising 6 other persons (Ex. 5E, p.2). The evidence indicates the claimant has been able to live independently, although he was reportedly married for 5 years (Ex. 19F, p. 2).

Tr. 20-21 ¶ 4.

Plaintiff contends that the ALJ's determination with respect to Listing 12.05 was in error because he possessed the requisite IQ scores for Paragraphs B, C, and D, and the ALJ never made a finding that any of the scores were invalid. While plaintiff tries to frame the issue around the validity of the IQ scores, plaintiff does not address the ALJ's threshold finding that plaintiff did not meet the diagnostic description of intellectual disability for lack of sufficient deficits in adaptive functioning.[11]

The court finds that the ALJ's determination on the descriptive definition suffers from no reversible error. More specifically, it finds that, with one immaterial exception, each of the reasons cited by the ALJ for his determination is supported by substantial evidence and based on proper legal standards.

The first basis cited by the ALJ for his determination is, of course, the conclusion by Dr. Albert that plaintiff functions at the borderline level. Dr. Albert stated that plaintiff "functions in the borderline range" and "certainly is not moderately mentally handicapped." Tr. 713. His conclusion is the product of an examination; he explains it well in his evaluation report; and he is a specialist in the field at issue. All these considerations tend to give weight to Dr. Albert's

---

[11] Indeed, plaintiff contends that Listing 12.05B "simply requires valid IQ scores of 59 or less *without regard to deficits in adaptive functioning or any other criteria*." Pl.'s Mem. (D.E. 22) 7 (emphasis added).

conclusion. *See* 20 C.F.R. §§ 404.1527(c)(1), (3), (5); 416.927(c)(1), (3), (5). Also tending to give it weight is, as the ALJ notes, its consistency with plaintiff's work history. *See id.* §§ 404.1527(c)(4); 416.927(c)(4). Further, the consulting nonexamining state agency psychologist at the reconsideration level, W.W. Albertson, Ed.D., concurred in Dr. Albert's conclusion. Tr. 95.

The ALJ also relied on plaintiff's work history as a basis for his determination that plaintiff did not have qualifying deficits in adaptive functioning. One aspect of plaintiff's work history mentioned by the ALJ is the extended nature of plaintiff's employment: continuous employment over the course of 14 years. The ALJ further pointed to the nature of plaintiff's work, as a sanitation worker and cemetery supervisor. He noted specifically that his employment tasks included driving and operating machinery and, in the cemetery job, supervising six people. Later in his decision, the ALJ recites the VE's findings that the cemetery job was skilled work and the sanitation job at the semi-skilled level.[12] Tr. 29 ¶ 6 (referencing Tr. 69). Case law establishes that a claimant's work history can properly be considered in evaluating a claimant's level of adaptive functioning. *See, e.g., Hancock v. Astrue*, 667 F.3d 470, 476 (4th Cir. 2012) (affirming ALJ's finding that claimant did not have deficits in adaptive functioning based on, among other evidence, claimant's work history); *Richardson v. Colvin*, No. 8:12-cv-3507-JDA, 2014 WL 793069, at *12 (D.S.C. 25 Feb. 2014) (holding that in determining level of adaptive functioning, "work history, while it cannot preclude benefits where the Listing 12.05C criteria are otherwise met, . . . can be relevant in determining whether a claimant manifested deficits in

---

[12] It is proper to consider this latter portion of the ALJ's decision because an ALJ's decision must be read as a whole. *See, e.g., Smith v. Astrue*, No. 11-1574, 2011 WL 6188731, at *1 (4th Cir. 14 Dec. 2011); *Lydia v. Astrue*, No. 2:11-1453-DCN-BHH, 2012 WL 3304107, at *5 (D.S.C. 25 Jul. 2012) ("This sort of deconstruction of the ALJ's decision[ ] is not useful. The ALJ's decision must be read as a whole."), *rep. & recomm. adopted*, 2012 WL 3308108, at *1 (13 Aug. 2012); *Finley v. Astrue*, No. 5:08-CV-209-D(l), 2009 WL 2489264, at *5 (E.D.N.C. 9 July 2009) ("[T]he ALJ's decision may appropriately be read 'as a whole.'" (quoting *Jones v. Barnhart*, 364 F.3d 501, 504-05 (3rd Cir. 2004))), *mem. & recomm. adopted*, 2009 WL 2489264, at *1 (13 Aug. 2009).

adaptive functioning"). In fact, the Fourth Circuit has specifically identified work as one of the areas to be considered in the assessment of adaptive functioning. *See Jackson*, 467 F. App'x at 218. While plaintiff contends that his past work was overstated by the ALJ, plaintiff himself testified that he worked steadily for 14 years and operated machinery and drove trucks as part of his work, and that his work as a cemetery worker included supervising inmates from a local prison. Tr. 46-48.

In addition, the ALJ cited to plaintiff's having obtained and kept a driver's license as a basis for his determination on adaptive functioning. This, too, is a proper consideration in evaluating a claimant's level of adaptive functioning. *Rowland v. Colvin*, No. 4:14-CV-000019, 2015 WL 2238958, at *7 (W.D. Va. 22 Apr. 2015) (considering success on driver's license test as evidence that plaintiff "did not have a deficit in adaptive function commensurate with Listing § 12.05's criteria"), *rep. & recomm. adopted*, 2015 WL 2238958, at *1 (12 May 2015).

A further basis given by the ALJ for his diagnostic description finding is plaintiff's ability to live independently, although he was reportedly married for several years. The ALJ later elaborates that plaintiff "reported being able to care for basic needs, cook occasionally, and do light house and yard work." Tr. 21 ¶ 4. Plaintiff himself testified that he lived alone. Tr. 54. Independent living is manifestly a relevant consideration in determining whether a claimant has deficits in adaptive functioning meeting the diagnostic description of intellectual disability. *Richardson*, 2014 WL 793069, at *12 (noting that "whether the claimant has ever lived independently is a relevant inquiry" for a determination of manifestation of deficits in adaptive functioning).

The ALJ also cited to evidence that plaintiff had not been enrolled in special education. An assessment of functional academic skills, including enrollment in special education, is a

proper area of consideration in assessing deficits in adaptive functioning. *See Jackson*, 467 F. App'x at 218. The ALJ found specifically that plaintiff initially denied being in special education classes in school and that no such placement was identified in his school records. While plaintiff did indicate in his 17 September 2012 Disability Report that he was not enrolled in special education classes (Tr. 204-05), the Commissioner now acknowledges that some school records do refer to plaintiff being enrolled in such classes (Tr., *e.g.*, 236). Thus, the ALJ's reliance on plaintiff's nonenrollment in special education was factually erroneous.

The court finds, however, that the error is harmless in light of the number and substantiality of the other reasons cited by the ALJ for his determination on the level of plaintiff's adaptive functioning. *See, e.g., Garner v. Astrue*, 436 F. App'x 224, 226 n* (4th Cir. 2011) (applying *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)). It is not plausible that the ALJ's conclusion on plaintiff's adaptive functioning would have been different had he not made the error.

In sum, the ALJ committed no reversible error in determining that plaintiff did not meet the diagnostic definition of Listing 12.05 and that he thereby did not meet this listing. *See Jackson v. Berryhill,* No. CV 5:15-2994-KDW, 2017 WL 586648, at *16 (D.S.C. 14 Feb. 2017) (affirming ALJ's finding was legally sound and supported by substantial evidence that plaintiff did not meet listing for intellectual disability based on lack of significant limitations in adaptive functioning); *Goble v. Colvin*, No. 7:15-CV-00049-RN, 2016 WL 3198246, at *5 (E.D.N.C. 8 June 2016) (finding that evidence cited by ALJ counseled against a finding that plaintiff possessed necessary deficits in adaptive functioning).

With respect to Listing 12.05D, in addition to finding that plaintiff did not satisfy the diagnostic description for intellectual disability, the ALJ found that he did not meet the severity criteria of that listing. The ALJ stated:

> However, the undersigned finds, in activities of daily living, the claimant has mild restriction. The claimant has previously reported being able to care for basic needs, cook occasionally, and do light house and yard work (Ex. 9E, p. 2; Ex. 19F, p. 2).
>
> In social functioning, the claimant has moderate difficulties. The claimant lives by himself and has indicated restricted activity due to health problems. He also testified to having some frustration issues due to communication and speech issues and that he gets nervous around crowds. However, he has reported he has friends and testified people will accompany him when shopping (Ex. 19F, p. 2).
>
> With regard to concentration, persistence or pace, the claimant has moderate difficulties. As noted above, the claimant has recorded low IQ scores and a DDS consultant considered the claimant to have marked limitations in the ability to understand, remember, and carry out detailed instructions (Ex. 5A, p. 12; Ex. 6A, p.12). However, despite any long-standing intellectual limitations, the undersigned notes that, per the testimony of the [VE], the claimant was previously able to perform work of a semi-skilled nature.
>
> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. There are no records showing that the claimant has been admitted for inpatient mental health treatment, or has otherwise experienced an exacerbation or temporary increase in symptoms or signs accompanied by a loss of adaptive functioning. Certainly, the record does not show three such episodes within a year, each lasting at least two weeks.
>
> Accordingly, the requirements in paragraph D are not satisfied.

Tr. 21-22 ¶ 4. Substantial evidence supports these findings by the ALJ, including the evidence he cites. Nonsatisfaction of the severity requirements provides an independent basis for plaintiff's not meeting Listing 12.05D. For this and the other reasons cited, the court rejects plaintiff's challenge to the ALJ's determination on Listing 12.05.

## V.    ALJ'S DETERMINATION ON AVAILABILITY OF WORK TO PLAINTIFF

Plaintiff challenges on two grounds the ALJ's determination at step five that jobs exist in

the national economy that plaintiff is capable of performing:  he erroneously found plaintiff to be

a high school graduate and, relying on the VE's testimony, misclassified plaintiff's prior jobs

under the DOT.

### A.    Plaintiff's Status as a High School Graduate

Plaintiff contends that the ALJ did not properly find him to be a high school graduate

because he received merely a certificate of attendance at high school, not a high school diploma.

Tr. 237.  But plaintiff himself testified that he graduated from high school.  Tr. 46.  In addition,

he reported in his 17 September 2012 Disability Report, which he completed himself, that he

completed twelfth grade and did not attend special education classes.  Tr. 204 no. 2.F.; 205 nos.

5.A., 5.B.

Similarly, while plaintiff argues in his memorandum that he is "likely functionally

illiterate," no such evidence was introduced at the hearing.  Pl.'s Mem. 13.  Moreover, plaintiff

indicated in his 17 September 2012 Disability Report that he could read and understand English.

Tr. 203 no. 1.H.  Thus, substantial evidence supports the ALJ's finding that plaintiff was a high

school graduate.

In any event, the ALJ himself acknowledged the potential conflict in the record regarding

plaintiff's status as a high school graduate and expressly found that his step five analysis would

have been the same had he found plaintiff not to be a graduate:

> Even if the claimant's education level were considered limited,[13] by virtue of
> having a certificate rather than a diploma, the fact that he performed skilled and

---

[13] Under the Regulations, "limited education" means

> [A]bility in reasoning, arithmetic, and language skills, but not enough to allow a person with these
> educational qualifications to do most of the more complex job duties needed in semi-skilled or

semi-skilled work would still result in a finding of not disabled under Medical Vocational Rule 202.11.

Tr. 30 ¶10 n.4. In lieu of Medical Vocational Rule 202.11, the ALJ had used as a framework for decision making at step five Medical Vocational Rule 202.14, which is based on a high school education or more, but otherwise on the same vocational factors as Medical Vocational Rule 202.11. Therefore, any error in the ALJ's finding plaintiff to be a high school graduate is harmless.[14] The court accordingly rejects plaintiff's challenge to this finding.

### B.  Plaintiff's Past Work

As noted, the ALJ adopted the VE's testimony that plaintiff's prior work as a sanitation worker meets the DOT definition of garbage collector driver (DOT #905.663-010). The definition for this occupation provides, as its title indicates, that the person "[d]rives packer-type truck, dump truck, or truck equipped with hydraulic lifting device to collect garbage and trash." DOT #905.663-010.[15] The garbage collector driver occupation has an SVP level of 3 (*see* DOT #905.663-010) and is therefore semi-skilled.

Plaintiff contends that his work actually meets the definition of garbage collector (DOT #955.687-022). The definition for this occupation provides that the person "[m]ay drive truck."

---

skilled jobs. [The Social Security Administration] generally consider[s] that a 7th grade through the 11th grade level of formal education is a limited education.

20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3).

[14] This same conclusion applies if plaintiff's attendance at special education classes were deemed to discredit the ALJ's finding that plaintiff is a high school graduate.

[15] The full definition of the garbage collector driver occupation reads: "Drives packer-type truck, dump truck, or truck equipped with hydraulic lifting device to collect garbage and trash, and transports load to disposal area. Records mileage and fuel consumption." DOT #905.663-010.

DOT #955.687-022.[16]  The garbage collector occupation has a specific vocational preparation

("SVP")[17] level of 1 (*see* DOT #955.687-022) and is therefore unskilled.

At the hearing, the ALJ asked plaintiff whether the following was a "pretty accurate"

description of his sanitation work:

> Now, the sanitation work you did through 2004, the way you described that in the
> very same report [previously referenced, *i.e.*, Exhibit 5E] is that you drove the
> garbage truck throughout the neighborhoods, half the shift you drove the truck,
> the other half you rode on the back, and I assume you would get out to lift the
> cans up and empty them into the truck, and then you would have to drive it to the
> landfill daily and unload.

Tr. 47-48.  Plaintiff responded affirmatively, stating, "Yes, sir, it is."  Tr. 48.  The report to

which the ALJ referred as the source of the description, Exhibit 5E (*see* Tr. 47), is plaintiff's 18

September 2012 Work History Report (Tr. 221), which was completed on the telephone with

plaintiff himself (Tr. 226).  In addition, plaintiff reported to several medical providers that his

occupation was that of a "truck driver."  *See* Tr. 341, 415.

Because it is undisputed that driving the garbage truck was a regular part of plaintiff's

position and not something he did only occasionally, the court finds no error in the ALJ's

classification of this work under the DOT as garbage collector driver, in accordance with the

VE's testimony, and therefore no error in his related finding that it was semi-skilled.  More

specifically, these determinations by the ALJ are supported by substantial evidence and based on

proper legal standards.

---

[16] The definition of the garbage collector occupation reads: "Collects refuse on designated route within municipality and dumps refuse from containers onto truck.  May be designated according to refuse collected as Trash Collector (motor trans.).  May drive truck [GARBAGE COLLECTOR DRIVER (motor trans.)].  May start hoisting device that raises refuse bin attached to rear of truck and dumps contents into opening in enclosed truck body."  DOT #955.687-022.

[17] An SVP level indicates "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  DOT app. C § II.  An SVP of 1 or 2 corresponds to unskilled work, semi-skilled as 3 or 4, and skilled as 5 to 9. Soc. Sec. R. 00–4p, 2000 WL 1898704, at *3 (4 Dec. 2000).

Plaintiff similarly argues that the ALJ's classification of his cemetery job as cemetery worker (DOT # 406.684-010)[18] overstated the complexity of this work because he was actually more of a grounds keeper with minimal supervisory duties. However, as with his sanitation worker position, plaintiff's own testimony supports the ALJ's determination. The ALJ asked plaintiff at the hearing whether the following description of his cemetery work was "pretty accurate":

> One of the [work history] reports, I believe it's 5E in our record, indicates that you would drive [a] tractor and a backhoe, dig the graves, cover them up, cut the grass, like you said, cut back tree. You would plant plants throughout the year at the cemetery, you would supervise inmates, I take it, from the local prison who would come out to do work to assist. They were allowed to use shovels and push mow as you indicate, no electrical equipment.

Tr. 47. Plaintiff responded that it was, stating, "Yes, sir." Tr. 47. Again, the description came from plaintiff's 18 September 2012 Work History Report reciting information obtained from plaintiff himself. Tr. 219. The cemetery worker occupation has an SVP level of 5 (see DOT # 406.684-010) and is therefore at the skilled level.

As with plaintiff's sanitation worker job, the court finds that the ALJ's classification of plaintiff's cemetery job under the DOT in accordance with the VE's testimony is supported by

---

[18] The definition of the cemetery worker occupation reads:

> Prepares graves and maintains cemetery grounds: Locates grave site according to section, lot, and plot numbers, and marks area to be excavated. Removes sod from gravesite, using shovel. Digs grave to specified depth, using pick and shovel or backhoe. Places concrete slabs on bottom and around grave to line it. Mixes and pours concrete to construct foundation for grave marker, using premixed concrete, wheelbarrow, and handtools. Positions casket-lowering device on grave, covers dirt pile and sod with artificial grass carpet, erects canopy, and arranges folding chairs to prepare site for burial service. Builds wooden forms for concrete slabs, using hammer, saw, and nails. Sets grave marker in concrete on gravesite, using shovel and trowel. Mows grass, using hand or power mower. Prunes shrubs, trims trees, and plants flowers and shrubs on grave, using handtools. Removes leaves and other debris from graves, using leaf blowers and weed eaters. May drive vehicles, such as backhoe, trucks, and tractors. May repair and maintain tools and equipment, using handtools and power tools and applying mechanical knowledge. May open and close mausoleum vaults, using handtools.

DOT # 406.684-010.

substantial evidence and based on proper legal standards. The court accordingly rejects plaintiff's challenge to this determination.

## VI.  CONCLUSION

For the foregoing reasons, based on its consideration of the record, the court concludes that the Commissioner's decision is supported by substantial evidence of record and contains no reversible error.  IT IS THEREFORE RECOMMENDED that the Commissioner's motion (D.E. 25) for judgment on the pleadings be ALLOWED, plaintiff's motion (D.E. 21) for judgment on the pleadings be DENIED, and the final decision of the Commissioner be AFFIRMED.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel.  Each party shall have until 14 August 2017 to file written objections to the Memorandum and Recommendation.  The presiding district judge must conduct her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions.  *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review.  In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the**

Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).

Any response to objections shall be filed within 14 days after filing of the objections.

This 31st day of July 2017.

James E. Gates
United States Magistrate Judge